Filed 3/10/14

CERTIFIED FOR PARTIAL PUBLICATION*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Nevada)

----

| | |
|---|---|
| MARK TANNER CONSTRUCTION, INC., et al., | C071176 |
| Plaintiffs and Appellants, | (Super. Ct. No. T104233C) |
| v. | |
| HUB INTERNATIONAL INSURANCE SERVICES, INC., | |
| Defendant and Respondent. | |

---

* Pursuant to California Rules of Court, rule 8.1110, this opinion is certified for publication with the exception of parts I and II.

APPEAL from a judgment of the Superior Court of Nevada County, Sean P. Dowling, Judge.  Affirmed.

Van Dyke Law Group and Glen Van Dyke for Plaintiffs and Appellants.

Lewis Brisbois Bisgaard & Smith, Jeffry A. Miller, Bruce L. Shaffer, Ernest Slome, and Lann G. McIntyre for Defendant and Respondent.


Compensation Risk Managers of California, LLC (CRM) administered a self-insured workers compensation program for contractors, Contractors Access Program of California (CAP).  Diversified Risk Insurance Brokers (Diversified), later acquired by defendant HUB International Insurance Services, Inc. (HUB), marketed and sold CAP to plaintiffs Mark Tanner Construction, Inc., and Mt. Lincoln Construction, Inc.

After CAP failed, leaving plaintiffs exposed to considerable liability, plaintiffs brought suit against HUB for professional negligence and constructive fraud.  While a defense motion for summary judgment was pending, plaintiffs obtained a copy of a Regional Field Consultant Agreement (Agreement) between CRM and Diversified that had not been provided to plaintiffs in discovery.  Plaintiffs believed the Agreement "significantly alter[ed] the legal landscape in this action."  They argued the Agreement established that rather than acting as broker for *them*, Diversified instead was acting as the broker for CAP.  Further, Plaintiffs argued that the Agreement revealed Diversified was part of a joint venture with CRM.  These relationships had not been disclosed to plaintiffs.

Plaintiffs moved for leave to file a second amended complaint to add new allegations and new causes of action arising from legal relationships revealed by the Agreement.  They also moved to continue the hearing on the summary judgment motion to permit additional discovery pursuant to Code of Civil Procedure section 437c,

2

subdivision (h).[1]  The trial court denied both motions, finding the Agreement was not the " 'silver bullet' " that plaintiffs claimed.[2]  The trial court granted HUB's motion for summary judgment.  Plaintiffs appeal from the ensuing judgment.

Plaintiffs contend the trial court abused its discretion in denying both the motion to amend the complaint and the motion to continue the summary judgment hearing.  They contend the court erred in finding that an amendment to the complaint would prejudice HUB.  They assert HUB's concealment of the Agreement in discovery is sufficient grounds to grant their motion to amend and they were entitled to a continuance because HUB withheld the Agreement.  Finally, plaintiffs contend it was error to grant summary judgment because there are triable issues of fact as to whether Diversified was broker for plaintiffs.

Apparently distracted by what they perceive to be an egregious discovery violation, plaintiffs fail to adequately challenge either the legal bases or the factual findings of the trial court's rulings.  We find plaintiffs have failed to carry their burden to demonstrate error.  Therefore, we shall affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

*The Parties and CAP*

Plaintiffs Mark Tanner Construction, Inc. (Tanner), and Mt. Lincoln Construction, Inc. (Mt. Lincoln), are both general contractors located in Truckee.  CAP is a self-insured workers compensation program for the construction industry.  The Department of Industrial Relations (the Department) regulates self-insured workers compensation programs.  (Lab. Code, § 3700, subd. (b); see Cal. Code Regs., tit. 8, §§ 15470 et seq.)

---

[1]  Undesignated statutory references are to the Code of Civil Procedure.

[2]  We assume the trial court meant the Agreement did not provide obvious proof of malfeasance.

The Department granted CAP a Certificate of Consent to Self-Insure in 2004. CRM administers CAP and contracted with Diversified to market CAP.

California contractors were able to fulfill their obligation to obtain workers compensation insurance by joining CAP. Membership in CAP required an agreement to be jointly and severally liable for the workers compensation liability of all other members for that year of membership. Approximately 250 employers became members of CAP.

Tanner became a member of CAP on January 1, 2006, and was a member from that date until December 31, 2008, and again from August through December of 2009. Diversified was the broker of record for Tanner from January 1, 2006, until about August 2007. Mt. Lincoln became a member of CAP on October 1, 2006, and was a member for approximately two years. Diversified was the broker for Mt. Lincoln. HUB purchased Diversified on November 1, 2007.

On December 31, 2009, CAP was terminated. The Director of the Department revoked CAP's certificate to self-insure and CAP was placed into conservatorship. CAP's estimated exposure for unfunded liabilities was over $20 million. In the spring of 2010, members were sent assessments for the anticipated exposure. Tanner was assessed $150,258 and Mt. Lincoln was assessed $42,784. Later that year, CAP defaulted on payment of benefits for its workers compensation liabilities.

*The Lawsuit*

In August 2010, Tanner, Mt. Lincoln, and two other companies sued HUB and others for professional negligence and constructive fraud.[3] The first amended complaint (FAC) alleged that CAP was marketed through insurance brokers, including Diversified, as a less expensive and more effective means of handling workers compensation insurance claims. Diversified did not disclose to Tanner or Mt. Lincoln its exclusive

---

[3] The other parties eventually settled, leaving only Tanner, Mt. Lincoln, and HUB as parties on appeal.

broker relationship with CRM. Diversified did not inform plaintiffs of the following facts concerning the financial stability of CAP: (1) beginning in 2006, CAP incurred losses of over $28 million and then over $60 million; (2) CRM was involved in a multimillion-dollar lawsuit in New York over similar self-insured insurance programs; (3) CAP's security bond was not renewed after 2008 and plaintiffs were unprotected if claims exceeded reserves; and (4) at least five other self-insured insurance programs administered by CRM in California had failed. The FAC alleged "[t]his information provided sufficient notice that agent brokers should investigate the proverbial health" of the self-insured workers compensation programs.

The FAC further alleged that CAP failed in 2009. It was set up dependent on new members to fund existing operations, which the FAC characterized as a "Ponzi-type scheme." Due to the decrease in construction work and the failures in New York, other brokers stopped marketing CAP, but Diversified did not provide that information to plaintiffs. As a result, plaintiffs were assessed for outstanding claims and faced further liability. Plaintiffs paid premiums for reinsurance, but were then told that no reinsurance was offered.

The first cause of action of the FAC was for professional negligence. The FAC alleged Diversified had a duty to use reasonable care as a professional. This duty required Diversified "to investigate, engage in a reasonable inquiry, discover and inform Plaintiffs of all information that might effect [*sic*] their decision to enroll in the CRM administered [CAP] including, but not limited to, the failures in New York, CAP's operating deficit, the failure of other CRM administered [self-insured insurance programs] in California, and the fact that the promises made about the program, including its price compared to other insurance programs, were false," and Diversified's relationship as exclusive broker for CRM for CAP. The FAC alleged that Diversified breached this duty and that breach was the proximate cause of plaintiffs' damages.

5

The second cause of action of the FAC was for constructive fraud. It alleged that Diversified was in a fiduciary relationship with plaintiffs and acted as an agent for CRM, but did not disclose that contractual relationship. As a result of this relationship, Diversified "had an obligation to refrain from providing information which [it] knew, or should have known, and/or was merely innocently transferred but was false, to the Plaintiffs, if that information was or may have been material to the Plaintiffs' decision to enroll in CAP." The FAC further alleged the information Diversified provided to plaintiffs was false and it failed to provide the information it should have known.

*The Motion for Summary Judgment*

In December 2011, HUB moved for summary judgment or summary adjudication, claiming both causes of action "lack[] merit." HUB argued that self-insured programs, such as CAP, were regulated by the Department, and it was the responsibility of the Department, not Diversified, to make "sure [] CAP met all mandated requirements." HUB argued, "Plaintiffs cannot demonstrate breach of a duty owed to them, because in California an insurance broker has no duty to investigate the financial condition of an insurer before placing insurance with it on the client's behalf. If a broker places insurance with an insurer which is properly conducting business, the duty of the broker has been fulfilled." HUB argued the claim for fraud failed "because there exists no fiduciary relationship between plaintiffs and HUB and Plaintiffs cannot show actual reliance on the alleged misrepresentations and/or non-disclosures attributed to" Diversified.

*The Regional Field Consultant Agreement*

Plaintiffs' counsel took the depositions of representatives of HUB in early February 2012 while the summary judgment motion was pending. Counsel declared that HUB did not produce any contract between HUB and CRM despite a request for production of documents that requested all documents that relate to any contracts or agreement between HUB and CRM. Counsel declared that when he returned from the

6

deposition he "was provided" with the Agreement between CRM as administrator/ program field consultant and Diversified as regional field consultant. The source of the Agreement was not disclosed.

The Agreement's stated purpose was "to assist in the growth, continuity and success of [CAP] by setting forth the marketing, promotional and sales duties and responsibilities of both parties." Under the Agreement, Diversified was to develop and implement a marketing plan for CAP, use its best efforts to generate new members, and submit to CRM all necessary underwriting data. Diversified was to be paid a fee based on a percentage, ranging from 5 to 8.5 percent, of the member's contributions to CAP. The Agreement provided that each party would hold confidential all information disclosed by the other. The Agreement was assignable, except that Diversified could not "assign or delegate its General Agency rights hereunder without the written consent of [CRM]."

*Response to Summary Judgment Motion*

In response to HUB's motion for summary judgment, plaintiffs requested a continuance pursuant section 437c, subdivision (h). Plaintiffs stated that less than two weeks earlier, their counsel had learned "that HUB had withheld the most important evidence as it would relate to the legal and factual relationships" between plaintiffs, HUB, CRM, and CAP. They claimed the Agreement established that HUB, rather than being the broker for plaintiffs, was the agent for CRM and the broker for CAP. "In short, the contract turns the lawsuit on its head." Plaintiffs claimed the Agreement gave rise to new causes of action for fraud, negligent representation, unfair business practices, and the violation of the Insurance Code.[4]

---

[4] These allegations were contained only in plaintiffs' motion to continue; at no point did plaintiff seek sanctions for a discovery violation (see §§ 2023.010-2023.040), or otherwise take action to establish that HUB had committed a discovery violation.

7

Plaintiffs argued that if the court denied the motion to continue, it must also deny HUB's motion for summary judgment. HUB had set forth as undisputed material facts that Diversified was the broker for Tanner and Mt. Lincoln. Plaintiffs disputed these facts, contending that under the Agreement, Diversified was the agent of CRM and the broker for CAP and these relationships were concealed. Plaintiffs further argued that if Diversified was their broker, Diversified owed them a fiduciary duty.

*Motion to Amend the Complaint*

Shortly after filing their response to HUB's motion for summary judgment, plaintiffs moved to amend their complaint. They asserted there was no prejudice to HUB because no trial date had been set, and any prejudice was "occasioned by the concealment of the existence of recently discovered contracts by the Defendants and the failure to produce the documents when formally requested." Plaintiffs asserted the recent discovery of the Agreement provided good cause for the amendment.

Plaintiffs proposed to file a second amended complaint (SAC). The SAC added factual allegations about the Agreement. The SAC alleged that had CRM and the brokers not been paid excessive consideration, CAP would not have failed. The SAC further alleged that Diversified directly or vicariously misrepresented and concealed certain facts, and had Diversified not concealed its contractual relationship with CRM, plaintiffs would not have entered into membership in CAP. The SAC added causes of action for negligence, intentional misrepresentation, fraud, and unfair competition.

*The Rulings*

The trial court denied plaintiffs' motion to file the SAC. The court found that the motion failed to demonstrate good cause to amend when balanced against the prejudice to defendants. (Although the record is not clear, it appears other defendants opposed the filing of the SAC on the ground that they would be prejudiced.) The trial court found defendants were prejudiced because they had prepared their defense based on the prior pleadings. The Agreement did not establish good cause. The FAC already alleged that

8

the brokers, including Diversified, were exclusive marketing agents for CRM. The court determined that while the Agreement supported the FAC, it added very little. It did not support the new allegations that Diversified was the general agent of CRM or that Diversified and CRM had a joint venture. The Agreement did not provide for the sharing of financial or confidential information except to the extent that if such information were shared, it was to remain confidential. Information that Diversified had a dual broker role was not new; the FAC alleged Diversified was the exclusive broker for CRM.

The trial court denied plaintiffs' request for a continuance. It found plaintiffs were dilatory in initiating discovery and that because the Agreement added little to the case, additional discovery based on this agreement was not necessary.

The trial court granted HUB's motion for summary judgment. The court found that HUB was entitled to summary judgment on the professional negligence claim because insurance brokers had no duty to investigate the financial condition of the insurer, and "no facts were presented demonstrating that Defendants knew or should have known of the financial condition of CAP." As to the claim for constructive fraud, the court found a duty to disclose arose in an arm's length business transaction only if there was a fiduciary relationship, and "Plaintiffs have failed to demonstrate a triable issue of material fact demonstrating that Defendants have a fiduciary relationship."

Judgment was entered for HUB, and plaintiffs appealed.

## DISCUSSION

### I

### *Denial of Motion to Amend*

Plaintiffs contend the trial court abused its discretion in denying their motion to amend the complaint. They argue that HUB failed to comply with discovery requests and then took advantage by moving for summary judgment on incomplete facts. They assert that the concealment of evidence alone was a sufficient ground for amendment. Further, they argue there is no support for the trial court's finding of prejudice.

9

A.  *The Law*

A trial court has discretion to allow an amendment to any pleading "upon any terms as may be just." (§ 473, subd. (a)(1); see also § 576.)  "This discretion should be exercised liberally in favor of amendments, for judicial policy favors resolution of all disputed matters in the same lawsuit.  [Citation.]"  (*Kittredge Sports Co. v. Superior Court* (1989) 213 Cal.App.3d 1045, 1047.)  An application to amend the pleadings is addressed to the trial court's sound discretion, and on appeal, it is appellant's burden to show an abuse of that discretion.  (*Berman v. Bromberg* (1997) 56 Cal.App.4th 936, 945.)  The discretion at issue is that of the trial court, not the appellate court.  Thus, even if the reviewing court might have ruled differently in the first instance, the trial court's order will stand unless, as a matter of law, it is not supported the record.  (*Branick v. Downey Savings and Loan Assn.* (2006) 39 Cal.4th 235, 242.)

A trial court does not abuse its discretion in denying leave to amend where the "party seeking amendment has been dilatory and/or delay has prejudiced or will prejudice the opposing party."  (*M&F Fishing, Inc. v. Sea-Pac Ins. Managers, Inc.* (2012) 202 Cal.App.4th 1509, 1534.)  Prejudice will be found where the amendment "changed the tenor and complexity of the complaint," delaying the trial, resulting in loss of critical evidence or added costs of preparation, and an increased burden of discovery.  (*Magpali v. Farmers Group, Inc*. (1996) 48 Cal.App.4th 471, 486–488.)  Leave to amend may also be denied where permitting an amendment would be futile.  (*Long v. Century Indemnity Co*. (2008) 163 Cal.App.4th 1460, 1468; *Vaillette v. Fireman's Fund Ins. Co*. (1993) 18 Cal.App.4th 680, 685.)  For example, it is futile where the amendment does not state a cause of action.  (*Foxborough v. Van Atta* (1994) 26 Cal.App.4th 217, 230)  " '[L]eave to amend should be denied where no liability exists under substantive law.'  (See *Heckendorn v. City of San Marino* (1986) 42 Cal.3d 481, 489.)"  (*La Jolla Village Homeowners' Assn. v. Superior Court* (1989) 212 Cal.App.3d 1131, 1141, disapproved on another point in *Jimenez v. Superior Court* (2002) 29 Cal.4th 473, 481, fn. 1.)

10

B. *Analysis*

Plaintiffs contend the trial court erred in denying their motion for leave to amend based on the concealment of the Agreement, a document they assert they requested in discovery and that was of prime importance to their case. They argue that concealment of the Agreement *alone* provided good cause for the amendment and that HUB should not be "rewarded for its wayward conduct." An alleged discovery violation is certainly a proper consideration in the trial court's determination of whether leave to amend is "in the furtherance of justice." (§ 473, subd. (a)(1).) Plaintiffs, however, cite no authority that a discovery violation, which plaintiffs failed to properly litigate or establish in the trial court, mandates granting leave to amend without evaluation of the significance of the concealed evidence. We have likewise found no authority for plaintiffs' assertion.

In denying the motion, the trial court found both prejudice to the defendants *and* that plaintiffs failed to establish good cause for the amendment. Plaintiffs primarily attack the first finding, while HUB relies upon the propriety of the second to defend the trial court's ruling. In challenging the finding of prejudice, plaintiffs first argue that HUB did not claim prejudice, suggesting that the trial court created "out of whole cloth" this excuse for denying relief. However, plaintiffs ignore that one of the other defendants did claim the amendment would prejudice them. Second, plaintiffs argue any prejudice was due entirely to defendants' wrongful concealment of the Agreement.

HUB does not respond to the arguments about prejudice; instead, it argues the trial court properly denied leave to amend because amendment would serve no useful purpose. HUB asserts it had no liability to plaintiffs under the undisputed facts. Since "one good reason is sufficient to sustain the order," we need not discuss other grounds. (*Sutter Health Uninsured Pricing Cases* (2009) 171 Cal.App.4th 495, 513.) Accordingly, we focus on whether it was proper to deny leave to amend because the amendment would serve no useful purpose and was therefore futile.

11

Plaintiffs acknowledge that the trial court found the Agreement supported the complaint, but added little to what was already alleged. Plaintiffs assert they "disagree with the analysis," but fail to explain how. They do not explain *how* the Agreement supported amending the complaint, nor do they explain the viability of the causes of action set forth in the SAC.[5] Plaintiffs assert the Agreement created a joint venture because Diversified was paid out of what members in CAP paid (a commission) and Diversified, with CRM, controlled marketing and gathered underwriting materials for each contractor. A joint venture requires an agreement to share profits and losses. (*580 Folsom Associates v. Prometheus Development Co.* (1990) 223 Cal.App.3d 1, 15.) Nothing in the Agreement even hints at an agreement to share profits and losses; it sets forth only Diversified's marketing duties and the amount of compensation. Plaintiffs contend the assignment clause of the Agreement, prohibiting assignment or delegation of general agency powers without the prior approval of CRM, shows Diversified was the general agent of CRM. The FAC alleged the brokers, once approved by CRM, became "the exclusive agents for CRM when marketing CAP in a given geographic region." Plaintiffs do not explain how the Agreement alters, in any significant way, this allegation such that amending the FAC was necessary.

---

[5] It is only in a section titled "Trial Court's Ruling" that plaintiffs make any attempt to challenge the trial court's findings that the Agreement did not show good cause for an amendment. This heading does not meet the requirement of California Rules of Court, rule 8.204(a)(1)(B) to "[s]tate each point under a separate heading or subheading summarizing the point." The failure to head an argument properly as required by the Rules of Court may forfeit the claim. (*Opdyk v. California Horse Racing Bd.* (1995) 34 Cal.App.4th 1826, 1830–1831, fn. 4.)

HUB argues that because plaintiffs failed to address the trial court's finding that an amendment would be futile, plaintiffs "waived" (more properly forfeited) any argument that the SAC asserts viable causes of action. (See *People v. JTH Tax, Inc.* (2013) 212 Cal.App.4th 1219, 1237 [failure to address alternative ground for ruling forfeits claim of error].) Plaintiffs do not respond to this argument in their reply brief. They limit their argument to lack of prejudice.

In short, plaintiffs fail to address in any meaningful or substantive way the trial court's finding that the motion failed to establish good cause to amend.[6] Instead, they fulminate over the unproven discovery violation and the trial court's finding of prejudice. The burden is on the party complaining to show an abuse of discretion. (*Denham v. Superior* Court (1970) 2 Cal.3d 557, 566.) Plaintiffs have failed to carry their burden.

II

*Denial of Motion to Continue*

Plaintiffs contend the trial court was required to grant a continuance pursuant to section 437c, subdivision (h) because counsel's affidavit complied with the requirements of that section. They contend the trial court erred in finding both a lack of diligence and that proposed discovery was not essential to plaintiffs' opposition to the summary judgment motion.

A. *The Law*

"If it appears from the affidavits submitted in opposition to a motion for summary judgment or summary adjudication or both that facts essential to justify opposition may

---

[6] At oral argument plaintiffs presented much fuller arguments as to why there was good cause to amend the complaint following discovery of the Agreement. There was not even a suggestion of these arguments in their briefing. Points first raised at oral argument are untimely and need not be considered. (*California Redevelopment Assn. v. Matosantos* (2013) 212 Cal.App.4th 1457, 1500.)

13

exist but cannot, for reasons stated, then be presented, the court shall deny the motion, or order a continuance to permit affidavits to be obtained or discovery to be had or may make any other order as may be just. The application to continue the motion to obtain necessary discovery may also be made by ex parte motion at any time on or before the date the opposition response to the motion is due." (§ 437c, subd. (h).)

"The nonmoving party seeking a continuance 'must show: (1) the facts to be obtained are essential to opposing the motion; (2) there is reason to believe such facts may exist; and (3) the reasons why additional time is needed to obtain these facts. [Citations.]' [Citation.]" (*Frazee v. Seely* (2002) 95 Cal.App.4th 627, 633.) "[S]ection 437c, subdivision (h) requires more than a simple recital that 'facts essential to justify opposition may exist.' The affidavit or declaration in support of the continuance request must detail the specific facts that would show the existence of controverting evidence." (*Lerma v. County of Orange* (2004) 120 Cal.App.4th 709, 715 (*Lerma*).) Otherwise, any unprepared party could use section 437c, subdivision (h) to get an automatic continuance. (*Lerma,* at p. 715.) "The party seeking the continuance must justify the need, by detailing both the particular essential facts that may exist and the specific reasons why they cannot then be presented." (*Id*. at p. 716.)

Where the party seeking a continuance of a summary judgment motion fails to meet the requirements of section 437c, subdivision (h), the court must determine whether that party has nonetheless established good cause for a continuance. (*Lerma, supra*, 120 Cal.App.4th at p. 716.) We review the trial court's decision for an abuse of discretion. (*Ibid*.)

B. *Counsel's Declaration*

Plaintiffs' counsel Glen Van Dyke filed a declaration in support of the motion to continue. In the declaration, Van Dyke first recited the details behind the "fortuitous discovery" of the Agreement and his belief that document "is but the tip of the iceberg with regard to the liability of HUB." He then outlined the discovery that was planned,

14

including noticed depositions. He stated that plaintiffs would seek to learn what other documents had not been produced "which implicate HUB's role with CRM and CAP and the ultimate failure of the CAP program." He stated, "Plaintiffs will seek documentation and oral testimony relating to compliance with the requirements placed on HUB and arising out of the [Agreement]." Finally, "Further discovery, through interrogatories and depositions, will be pursued to determine what the relationship was between CAP and the Defendants."

C. *Analysis*

Van Dyke's declaration fails to fulfill the requirements of section 437c, subdivision (h). Nowhere does it "detail the *specific facts* that would show the existence of controverting evidence." (*Lerma, supra,* 120 Cal.App.4th at p. 715, italics added.) Instead, the declaration indicates plaintiffs seek to *learn* HUB's role with respect to CAP and CRM (presumably other than as the broker marketing CAP). Van Dyke does not suggest what that role might be, how discovery of that unidentified role will aid in opposing summary judgment, or even why plaintiffs were unable previously to establish HUB's role. Plaintiffs admit that "[w]hat discovery would uncover is unknown." In other words, plaintiffs seek leave to embark on a "fishing expedition," seeking to discover unknown facts of undetermined significance.

The declaration in support of the continuance focuses on HUB's alleged discovery violation. Van Dyke states he intends to depose HUB's counsel "with regard to the existence and location of, and search for, the [Agreement]." Plaintiffs will also ask "what other documents were withheld." Thus, the proposed discovery appears intended to establish a discovery violation, not to seek facts essential to opposing the summary judgment motion. Seeking a continuance solely on the basis of inadequate discovery responses fails to meet the requirements of section 437c, subdivision (h). (*California Automobile Ins. Co. v. Hogan* (2003) 112 Cal.App.4th 1292, 1305.) In *Hogan*, in opposition to a motion for summary judgment, appellants sought a continuance on the

15

ground that respondent "had 'been less than forthright' in its discovery responses," so additional discovery was needed.  The court found appellants had failed to meet the requirements for a continuance as the declaration failed to set forth what facts appellants hoped to obtain or why such facts were essential to opposing the motion for summary judgment.  (*Ibid.*)  The court found no abuse of discretion in denying the request for a continuance.  (*Id*. at p. 1306.)

Plaintiffs failed to meet the requirements of section 437c, subdivision (h), and offered no other good cause for a continuance.  The trial court did not abuse its discretion in denying plaintiffs' request for a continuance.

III

*Grant of Summary Judgment Motion*

Plaintiffs contend the trial court erred in granting HUB's motion for summary judgment.  Plaintiffs contend there was a triable issue of material fact, namely, Diversified's role, whether it was as the broker for Tanner and Mt. Lincoln, or as the general agent for CRM and the broker for CAP.

A.  *Standard of Review*

"The motion for summary judgment shall be granted if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (§ 437c, subd. (c).)  A defendant meets his burden of showing that a cause of action has no merit if he shows that one or more of the elements of the cause of action cannot be established, or that there is a complete defense. (§ 437c, subd. (p)(2).)  Once the defendant has met that burden, the burden shifts to the plaintiff to show that a triable issue of material fact exists.  (*Ibid*.)

We review the trial court's grant of summary judgment de novo.  (*State of California v. Allstate Ins. Co.* (2009) 45 Cal.4th 1008, 1017-1018.)  We employ the same three-step analysis as the trial court.  " 'First, we identify the issues raised by the pleadings, since it is these allegations to which the motion must respond; secondly, we

16

determine whether the moving party's showing has established facts which negate the opponent's claims and justify a judgment in movant's favor; when a summary judgment motion prima facie justifies a judgment, the third and final step is to determine whether the opposition demonstrates the existence of a triable, material factual issue.' [Citation.]" (*Waschek v. Dept. of Motor Vehicles* (1997) 59 Cal.App.4th 640, 644.)

Plaintiffs, as appellants, have the burden to show error. (*Claudio v. Regents of the University of California* (2005) 134 Cal.App.4th 224, 230.) "[D]e novo review does not obligate us to cull the record for the benefit of the appellant in order to attempt to uncover the requisite triable issues. As with an appeal from any judgment, it is the appellant's responsibility to affirmatively demonstrate error and, therefore, to point out the triable issues the appellant claims are present by citation to the record and any supporting authority. In other words, *review is limited to issues which have been adequately raised and briefed*. [Citations.]" (*Lewis v. County of Sacramento* (2001) 93 Cal.App.4th 107, 116, italics added.)

B. *The Law: Insurance Brokers and Their Duties*

An insurance broker is "a person who, for compensation and on behalf of another person, transacts insurance other than life . . . with, but not on behalf of, an insurer." (Ins. Code, §§ 33, 1623.) Generally, an insurance agent acts only as the agent for the insured in procuring a policy of insurance. (*Carlton v. St Paul Mercury Ins. Co.* (1994) 30 Cal.App.4th 1450, 1457 An insurance broker may, however, act in a dual capacity, in which he serves as the insured's broker in *procuring* insurance but also acts as the insurer's agent by collecting the premium and delivering the policy to the insured. (Ins. Code, § 1732; *Maloney v. Rhode Island Ins. Co.* (1953) 115 Cal.App.2d 238, 244.)

"Insurance brokers owe a limited duty to their clients, which is only 'to use reasonable care, diligence, and judgment in procuring the insurance requested by an insured.' [Citations.] Accordingly, an insurance broker does not breach its duty to clients to procure the requested insurance policy unless '(a) the [broker] misrepresents the

17

nature, extent or scope of the coverage being offered or provided . . . , (b) there is a request or inquiry by the insured for a particular type or extent of coverage . . . , or (c) the [broker] assumes an additional duty by either express agreement or by "holding himself out" as having expertise in a given field of insurance being sought by the insured.' [Citation.]" (*Pacific Rim Mechanical Contractors, Inc. v. Aon Risk Ins. Services West, Inc*. (2012) 203 Cal.App.4th 1278, 1283 (*Pacific Rim*).) "California law is well settled as to this limited duty on the part of insurance brokers. [Citations.]" (*Ibid*.)

"[A]n insurance broker . . . owes no duty to its clients to investigate the financial condition of an insurer before placing insurance with it on their behalf." (*Wilson v. All Service Ins. Corp*. (1979) 91 Cal.App.3d 793, 798 (*Wilson*).) The *Wilson* court reasoned that the Insurance Code prescribes the financial requirements for an insurer and the Insurance Commissioner has the continuing duty to oversee that financial condition, thus it would be "superfluous" and "would create a conflict with the regulatory scheme" to impose on the broker "a similar duty to ascertain the financial soundness of an insurer." (*Id.* at pp. 797-798.) In the case of self-funded workers compensation programs, regulation is by the Department. (Lab. Code, § 3700, subd. (b); see Cal. Code Regs., tit. 8, §§ 15470 et seq.)

In *Kotlar v. Hartford Fire Ins. Co*. (2000) 83 Cal.App.4th 1116 at page 1123 (*Kotlar*), the court held an insurance broker has no duty to give a named insured notice of the insurer's intent to cancel the policy; that duty rests with the insurer. Relying on *Kotlar,* the court in *Pacific Rim, supra,* 203 Cal.App.4th 1278 at page 1284, held that an insurance broker had no duty to inform an additional insured (a subcontractor) of the insurer's insolvency. In declining to find a new duty on the part of insurance brokers, the *Pacific Rim* court concluded "that imposition of a duty requiring insurance brokers to inform an insured of 'any adverse changes in the carrier's financial capability' postissuance of the insured's policy is properly the function of the Legislature because it would (a) fundamentally alter the nature and corresponding duties of insurance brokers,

18

which would (b) increase the costs of procuring insurance." (*Pacific Rim, supra,* 203 Cal.App.4th at p. 1285.)

"[I]t is unclear whether a fiduciary relationship exists between an insurance broker and an insured." (*Hydro–Mill Co., Inc. v. Hayward, Tilton & Rolapp Ins. Associates, Inc.* (2004) 115 Cal.App.4th 1145, 1156 (*Hydro–Mill*).) An insurance broker does act in a fiduciary capacity when he receives and holds premiums or premium refunds. (Ins. Code, § 1733.) In *Eddy v. Sharp* (1988) 199 Cal.App.3d 858 (*Eddy*), this court reversed a summary judgment in favor of a broker on claims of negligent misrepresentation and breach of contract. The broker prepared a proposal for insurance that stated coverage was "All Risk," but failed to disclose that it provided no coverage for sewer backups. (*Id*. at p. 866.) We found there was a triable issue of fact as to whether the broker breached his duty by misrepresenting the terms of the policy. (*Ibid*.) We commented in dicta that under agency principles, the broker had "not only a fiduciary duty but an obligation to use due care." (*Id*. at p. 865; see also *Westrec Marina Management, Inc. v. Jardine Ins. Brokers Orange County, Inc.* (2000) 85 Cal.App.4th 1042, 1045, [defendant brokers were found liable for breach of fiduciary duty and breach of their professional duty in their placement of insurance].) In *Hydro-Mill*, the court found allegations of the broker's breach of fiduciary duty amounted to a claim of professional negligence. Accordingly, the court applied the shorter two-year statute of limitations, rather than the longer one for breach of a fiduciary duty. (*Hydro-Mill, supra,* 115 Cal.App.4th at pp. 1158-1159.) The court reasoned that since it was established that "an insurer is not a fiduciary, then arguably, neither is a broker." (*Id*. at p. 1158.) In refusing to expand a broker's duties, the *Kotlar* court distinguished the broker-client relationship from the attorney-client relationship; lawyers have a fiduciary duty of the highest order and must represent clients zealously within the bounds of the law, while brokers need to use only reasonable care and may represent both the insured and the insurer. (*Kotlar, supra,* 83 Cal.App.4th at p. 1123.)

19

From these cases we conclude that, other than when handling an insured's money, a broker's duty--whether or not phrased as a fiduciary duty--is no greater than the duty to use reasonable care and diligence in procuring insurance. As one leading treatise has observed: "It is not clear in what respect the 'fiduciary duty' owed by an independent insurance agent [broker] differs from the duty of due (reasonable) care. As used in respect to an independent agent, 'fiduciary duty' may refer merely to avoidance of conflict of interest, self-dealing, excessive compensation, etc." (Croskey et al., Cal. Practice Guide: Insurance Litigation (The Rutter Group 2012) ¶ 11:166, p. 11–40.)

C. *Analysis*

1. *Claim for Professional Negligence*

The first cause of action in the FAC alleged that Diversified breached its duty to use reasonable care by failing "to investigate, engage in reasonable inquiry, discover and inform Plaintiffs" of information, including the failures of CRM-managed self-insured workers compensation programs in New York and California, CAP's deficit, the falsity of promises regarding price, and Diversified's relationship as an exclusive broker for CAP. Tellingly, the FAC did not allege that Diversified knew or should have known that representations it made about CAP were false.[7]

HUB moved for summary judgment on the ground that Diversified fulfilled its duty by procuring insurance for plaintiffs. HUB argued Diversified had no additional duty to investigate the financial condition of the insurer. In support, HUB offered as undisputed facts that Diversified was the insurance broker for Tanner and Mt. Lincoln, who became members of CAP. To establish that Diversified was the broker for plaintiffs,

_____

[7] The FAC did allege that CAP's security bond was not renewed after 2007, leaving plaintiffs exposed, "a condition that, unknown to Plaintiffs but knowable by Defendants, had existed since 2007." There is no allegation defendants "should have known." Further, plaintiffs did not dispute HUB's undisputed fact that the required surety bond was in place in 2009.

20

HUB offered the allegations of the FAC which expressly so stated. In opposition, plaintiffs disputed these facts, citing as evidence the Agreement.

Plaintiffs' opposition was insufficient to create a triable issue of fact. First, plaintiffs are bound by their allegations in the FAC. " 'A defendant moving for summary judgment may rely on the allegations contained in the plaintiff's complaint, which constitute judicial admissions. As such they are conclusive concessions of the truth of a matter and have the effect of removing it from the issues.' [Citations.]" (*Castillo v. Barrera* (2007) 146 Cal.App.4th 1317, 1324.) The admissions may not be contradicted in opposing summary judgment. (*St. Paul Mercury Ins. Co. v. Frontier Pacific Ins. Co.* (2003) 111 Cal.App.4th 1234, 1248.)

Second, the Agreement did not constitute evidence that Diversified was *not* the broker for plaintiffs. The Agreement was a marketing agreement. Nothing in it refuted Diversified's role as insurance broker for plaintiffs. An insurance broker may act in a dual capacity. (Ins. Code, § 1732.) The FAC did not allege any conflict of interest.

Plaintiffs contend Diversified's duty to them should be analyzed under *Biakanja v. Irving* (1958) 49 Cal.2d 647. In *Baikanja*, our Supreme Court held that a defendant's negligent performance of a contractual obligation resulting in damage to the property or economic interests of a person not in privity could support recovery if the defendant was under a duty to protect those interests, and the court articulated a test for identifying such a duty. (*Id*. at pp. 648-650.) Here, as in *Pacific Rim*, *Biakanja* does not apply because plaintiffs' claims against HUB are based on negligence, not on breach of any contractual duty. (*Pacific Rim, supra,* 203 Cal.App.4th at pp. 1291-1292.)

The trial court did not err in granting HUB summary judgment on the first cause of action for professional negligence.

21

### 2. *Constructive Fraud*

The second cause of action in the FAC alleged constructive fraud.  It alleged that Diversified was in a fiduciary relationship with plaintiffs.  Due to that relationship, Diversified had an obligation to refrain from providing information it knew or should have known (or that was merely innocently transferred) was false, if such information may have been material to plaintiffs' decision to enroll in CAP.  The factual representations Diversified provided were false, and it never disclosed its exclusive broker arrangement with CRM.

HUB moved for summary judgment, asserting that Diversified did not have a fiduciary relationship with plaintiffs and plaintiffs could not establish that Diversified had any reason to know of the financial troubles of CAP and CRM or mislead plaintiffs to their prejudice.  In support, HUB offered a number of undisputed facts.  CAP was granted a certificate to self-insure, the Department regulated CAP, and CAP had the required surety bond in place in 2009.  The president and the controller of Mt. Lincoln met with two or three people to discuss CAP.  They could not recall exactly what was represented, but immediately afterwards decided to join CAP.  The president of Tanner had several phone calls with a broker from Diversified about CAP; the broker gave him the phone number of someone at CRM and the president received a balance sheet and information about CAP's performance bond, assets, and claims.

Plaintiffs did not dispute these facts.  Instead, their opposition to summary judgment was based on the existence of Agreement and their sole dispute was whether Diversified was their broker.  Relying on *Eddy, supra,* 199 Cal.App.3d 858, they argued Diversified owed them a fiduciary duty.

" 'Constructive fraud is a unique species of fraud applicable only to a fiduciary or confidential relationship.  [Citation.]'  [¶]  '[A]s a general principle constructive fraud comprises any act, omission or concealment involving a breach of legal or equitable duty,

22

trust or confidence which results in damage to another even though the conduct is not otherwise fraudulent. Most acts by an agent in breach of his fiduciary duties constitute constructive fraud. The failure of the fiduciary to disclose a material fact to his principal which might affect the fiduciary's motives or the principal's decision, which is known (or should be known) to the fiduciary, may constitute constructive fraud. . . . [Citation.]' " (*Salahutdin v. Valley of California, Inc*. (1994) 24 Cal.App.4th 555, 562.)

"Constructive fraud depends on the existence of a fiduciary relationship of some kind . . . ." (5 Witkin, Cal. Procedure (5th ed. 2008) Pleading, § 717, p. 133.) As our discussion *ante* shows, there is some dispute as to whether an insurance broker has a fiduciary duty, other than in handling the insured's money. There is no authority, however, that any fiduciary duty owed by an insurance broker would extend to areas beyond the recognized duty to use reasonable care and diligence in the procuring of insurance at the insured's request. In *Eddy*, the sole case upon which plaintiffs rely for a fiduciary duty, the act at issue was the failure to disclose an exclusion in an "All Risk" policy. (*Eddy. supra,* 199 Cal.App.3d at p. 866.) A broker may be liable for misrepresenting the nature, scope, or extent of coverage. (*Free v. Republic Ins. Co.* (1992) 8 Cal.App.4th 1726, 1730.) By contrast, an insurance broker has no duty to ascertain the financial soundness of the insurer (*Wilson*, *supra,* 91 Cal.App.3d at p. 798), or to advise an insured of adverse changes in the insurer's financial capability. (*Pacific Rim, supra,* 203 Cal.App.4th at p. 1284.) Accordingly, there can be no fiduciary duty in these areas.

The trial court did not err in granting summary judgment on the second cause of action for constructive fraud.

## DISPOSITION

The judgment is affirmed.  HUB shall recover costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(1) & (2).)

        DUARTE       , J.

We concur:

     NICHOLSON    , Acting P. J.

     ROBIE        , J.